# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | | |
|---|---|---|
| ZEENATH ABPLANALP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  3:15-cv-00203 |
| | ) | |
| UNITED COLLECTION BUREAU, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT UNITED COLLECTION BUREAU, INC.'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AND TO COMPEL ARBITRATION, OR, IN THE ALTERNATIVE, TO STAY THE PROCEEDINGS

Defendant United Collection Bureau ("UCB"), by and through its counsel, submits this Memorandum in Support of its Motion to Dismiss and to Compel Arbitration, or, in the alternative, to Stay the Proceedings.

## INTRODUCTION

As there is a dispute between the parties that is covered by a written arbitration agreement, Plaintiff Zeenath Abplanalp ("Plaintiff") is required to arbitrate her claims brought in this lawsuit against UCB[1] under the Federal Arbitration Act ("FAA").  UCB submits this case should be dismissed and Plaintiff should be compelled to submit her claims to arbitration.

Plaintiff's claims are asserted against UCB for its alleged actions in an attempt to collect a debt on behalf of Citibank, N.A. ("Citibank").  (Compl. ¶ 24).  Plaintiff's Card Agreement with Citibank contains a written arbitration provision ("Arbitration Agreement").  The Arbitration Agreement provides that claims made by Plaintiff against anyone connected with or claiming

---

[1] Plaintiff alleges in this lawsuit that UCB engaged in conduct prohibited by the TCPA, the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq*., and the North Carolina Debt Collection Act, N.C. Gen. Stat. § 58-70-90, *et seq*. ("NCDCA"). (Compl. *passim*).

through Citibank, including anyone to whom Plaintiff's debt was assigned for collection, as well as claims regarding the application, enforceability or interpretation of this arbitration provision, are subject to arbitration, including but not limited to claims related to statutory or regulatory provisions regarding debt collection. UCB, as a party connected with and claiming through Citibank and to whom the debt was assigned for collection, has demanded that Plaintiff submit his purported claims in this lawsuit to arbitration, but Plaintiff has failed to do so. UCB now seeks dismissal of this lawsuit and the entry of an order compelling Plaintiff to arbitrate her claims against UCB.

Alternatively, if the court does not compel arbitration, UCB respectfully submits the Court should stay this action in the interest of judicial economy and efficiency for two separate reasons: (1) the pending resolution of the challenges currently before the Federal Communications Commission ("FCC") concerning what telephony systems qualify as an automatic telephone dialing system ("ATDS"), which should be dispositive of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq*., ("TCPA") claims asserted herein by Plaintiff, and (2) the pending class action settlement in *Graff v. United Collection Bureau, Inc.*, Case No. 2:12-cv-02402 (E.D.N.Y.) ("*Graff*"), which should be dispositive of claims brought by Plaintiff in this case.

First, Plaintiff's claims for alleged violations of the TCPA are subject to a pending challenge in the Court of Appeals for the District of Columbia Circuit to the FCC's July 2015 Declaratory Ruling and Order interpreting the TCPA. *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling and Order, 30 FCC Rcd. 7961 (2015) (the "FCC Order"). Specifically, Plaintiff alleges that calls placed manually to her alleged cellular phone number are violations of the TCPA because, although the

calls were manually dialed, Plaintiff claims the telephony system used to place calls had the capacity to place an autodialed call and thus she claims it qualifies as an ATDS within TCPA, in particular as an ATDS is defined by the FCC Order. Several appeals from the FCC's Order have been filed and are presently proceeding in the Court of Appeals for the District of Columbia Circuit, the resolution of any of which could be dispositive to the TCPA claims in this case. *See*, *e.g.*, *ACA Int'l v. FCC*, No. 15-1211 (D.C. Cir. filed July 10, 2015). The pending challenges to the FCC's Order favor a stay of this case pending resolution of those appeals pursuant to the primary jurisdiction doctrine.

Second, Plaintiff is a member of a settlement class in *Graff*. While the *Graff* settlement has received preliminary approval, it has not yet received final approval. UCB believes many of the claims asserted by Plaintiff are subject to the *Graff* settlement if it is approved and thus they will be precluded by the doctrines of release and/or *res judicata*. Accordingly, a stay of this case is the most efficient way of managing these proceedings until the court in *Graff* issues a final decision on the pending request for approval of a class settlement.

<u>**BACKGROUND**</u>

**A.      Plaintiff's Written Arbitration Agreement**

1.      On or about May 9, 2014, Citibank placed with UCB a credit card account for collection (the "Account") that was opened by Plaintiff with Citibank. (Declaration of Coleen McNinch ("McNinch Decl."), attached to Docket Entry No. 10 as Exhibit 2, pp. 1-3, ¶ 9.)

2.      Citibank provided UCB with the Card Agreement associated with the Account. (*Id*. at ¶ 11; the Card Agreement is attached as Exhibit A to the McNinch Decl., Docket No., 10, pp. 4-9.)

3.     The Card Agreement for Plaintiff's Account states it "is your [Plaintiff's] contract with us [Citibank, N.A.]", and "[i]t governs" Plaintiff's "use" of her credit card and the Account. (Card Agreement, p. 1.)

4.     The Card Agreement states "[t]his Agreement is binding on you unless you close your account within 30 days after receiving the card and you have not used or authorized use of the card." (Card Agreement, p. 1.)

5.     The Card Agreement states in the section entitled "Assignment" that "Citibank may assign any or all of our rights and obligations under this Agreement to a third party." (*Id.*, p. 6.)

6.     The Card Agreement contains an Arbitration Agreement, (*Id.*, pp. 4-6), which "provides that any dispute any be resolved by binding arbitration" and "[either] your or we may, without the other's consent, elect mandatory, binding arbitration for any claim, dispute or controversy between you and us (called 'Claims')," (*Id.*, pp. 4.)

7.     The section entitled "What Claims are subject to arbitration" states that:

> All claims relating to [Plaintiff's] account, a prior related account, or our relationship are subject to arbitration, including Claims regarding the application, enforceability or interpretation of this Agreement and this arbitration provision. All Claims are subject to arbitration, no matter what legal theory they are based on or what remedy (Damages, injunctive or declaratory relief) they seek.

(*Id.*)

8.     In the section of the Arbitration Agreement entitled "Whose Claims are subject to arbitration," it states that Claims subject to arbitration include claims made by Plaintiff "against anyone connected with [Citibank] or [Plaintiff] or claiming through [Citibank] or [Plaintiff], such as … an employee, agent, representative, affiliated company, predecessor or successor, heir, assignee, …." (*Id.*)

9.     The Arbitration Agreement contains a section entitled "Broadest interpretation" that provides the arbitration provision "is governed by the Federal Arbitration Act ("FAA")" and provides that "[a]ny questions about whether Claims are subject to arbitration shall be resolved by interpreting this arbitration provision in the broadest way the law will allow it to be enforced." (*Id.*, p. 5.)

10.     In the "What about debt collection" paragraph in the Arbitration Agreement, it states that "[Citibank] and anyone to whom we assign your debt … may seek arbitration on an individual basis of any Claim asserted by you, whether in arbitration or any proceeding, …." (*Id.*)

### B.     The Present Litigation

11.     On March 30, 2015, Plaintiff filed a Complaint against UCB in the General Court of Justice, Superior Court Division for the County of Mecklenburg, North Carolina, Case No. 15-CVS-6151 (the "State Court Action"), alleging violations of the TCPA, FDCPA and NCDCA. (ECF No. 1-1).

12.     Plaintiff specifically alleges in the Complaint that UCB "was collecting on an alleged debt originally owed to Citi Bank, N.A." (Complaint, ¶ 13.)

13.     On May 5, 2015, UCB timely removed the State Court Action to this Court. (ECF No. 1).

14.     On September 24, 2015, UCB requested that Plaintiff submit his claims to arbitration.  UCB thereafter also provided the Card Agreement containing the Arbitration Agreement to counsel for Plaintiff via email and again requesting an agreement to arbitrate this dispute.

15.     Plaintiff would not to agree to arbitration of the claims in this case.

16.     On September 28, 2015, UCB filed a Motion for Leave to Amend its Answer to the Complaint, seeking to add additional affirmative defenses including the defenses of *res judicata*, release, and lack of subject matter jurisdiction. (ECF No. 7). This Motion was granted on October 27, 2015. (ECF No. 11.)

### C.     Plaintiff Is A Member Of The Proposed Settlement Class In *Graff*

17.     The applicable class action settlement in *Graff* received preliminary approval, but has not received final approval. (*Graff*, ECF No. 60.)

18.     Heffler Claims Group ("Heffler") was appointed class administrator by the United States District Court for the Eastern District of New York to provide notification and other services in the *Graff* settlement (the "Settlement"). (Declaration of David Kaufman ("Kaufman Decl."), attached to Docket Entry No. 10 as Exhibit 1, ¶ 4.)

19.     Plaintiff is a member of the proposed settlement class in *Graff*. (Kaufman Decl., ¶ 7).

20.     Plaintiff was mailed a Postcard Notice, via first-class mail, which advised her of information concerning *Graff* and of the deadlines to request exclusion from the Settlement, how to object to the Settlement and provided other information. (Kaufman Decl., ¶ 7.)

21.     Heffler has no record of the Postcard Notice mailed to Plaintiff coming back as undeliverable or being returned with a forwarding address. (Kaufman Decl., ¶ 8.)

22.     Heffler has no record of receiving any correspondence from Plaintiff and has no record of Plaintiff requesting exclusion from the Settlement. (*Id*.)

23.     The section entitled "Release and Retention of Certain Rights and Claims" contained in the Stipulation of Settlement (the "*Graff* Release"), which was filed with the *Graff* court as Exhibit 2 to the Consent Motion to Certify Class and Grant Preliminary Approval to the

Parties' Class Settlement Agreement, states that it encompasses any claims "…*related to the allegations in the Complaint, Amended Complaint and/or any claims that could have been brought arising out of the allegations* set forth in the Complaint and/or Amended Complaint (the "Released Claims")." (*Graff*, ECF No. 58, Exhibit 2, p. 15; emphasis added.)

24.    The *Graff* Release further states:

> This release includes, but is not limited to all claimed or unclaimed compensatory damages, actual damages, damages stemming from any allegations of willfulness, recklessness, damages for emotional distress, statutory damages, consequential damages, incidental damages, treble damages, punitive and exemplary damages, as well as all claims for equitable, declaratory, or injunctive relief *under any federal or state statute or common law or other theory that was alleged or could have been sought based on the facts alleged in the Action*, including but not limited to *any and all claims under deceptive or unfair practices statutes*, *or any other statute, regulation or judicial interpretation.* This release also includes interest, attorney's fees, costs and expenses arising out of any of the claims described above.

(*Id*.; emphasis added.)

25.    Accordingly, UCB files this Motion to request that the Court compel Plaintiff to submit his purported claims to arbitration, or in the alternative stay the proceedings.

## ARGUMENT

I.    **The Arbitration Agreement Expressly Requires Plaintiff to Arbitrate Her Claims, therefore this Court Should Dismiss the Complaint and Compel Arbitration of this Matter.**

A.    **The Federal Arbitration Act Governs and Requires Arbitration.**

As noted above, the written Arbitration Agreement provides that it will be governed by the FAA.  *See* Arbitration Agreement, Ex. A to McNinch Decl., pp. 4-6 of Card Agreement. Therefore Plaintiff's claims against UCB must be submitted to arbitration in accordance with the terms of the written Arbitration Agreement since the FAA therefore mandates arbitration of the claims at issue in this case. *See Garrett v. Margolis, Pritzker, Epstein & Blatt, P.A.*, 861 F. Supp.

2d 724; 2012 U.S. Dist. LEXIS 43113 (E.D. Va. Mar. 28, 2012) (granting motion to compel arbitration and holding "a debt collector plainly acting on behalf of the original creditor may compel arbitration of a dispute").

"As a result of th[e] federal policy [stated in the FAA] favoring arbitration, 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability.'" *Patten Grading & Paving, Inc. v. Skanska USA Building, Inc.*, 380 F.3d 200, 204 (4th Cir. 2004) (emphasis deleted) (quoting *Moses H.Cone Memorial Hospital v. Mercury Construction Corporation*, 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)); *accord Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, Inc., 473 U.S. 614, 626 (1985) ("The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."); *Levin v. Alms & Assocs.*, 634 F.3d 260, 266-67 (4th Cir. 2011) (quotations omitted). The FAA, by its terms, leaves no place for the exercise of discretion by a district court, but instead mandates that the district court shall direct the parties to proceed to arbitration on issues as to which the Arbitration Agreement applies. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). Indeed, the Supreme Court, in a series of recent decisions, has reaffirmed that the FAA mandates a continuing commitment to enforcing agreements to arbitrate disputes, including those involving claims under federal consumer protection statutes. *See*, *e.g*., *AT&T Mobility LLC v. Concepcion* 131 S. Ct. 1740, 2011 U.S. LEXIS 3367 (2011) (FAA preempts state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives such that waivers of class arbitration in consumer contracts are enforceable); *Rent-A-Center, West v. Jackson*, 130 S. Ct.

2772, 2010 U.S. LEXIS 4981 (2010) (rejecting challenge to the validity of an arbitration agreement).

To facilitate the enforcement of arbitration agreement, section 4 of the FAA "requires courts to compel arbitration 'in accordance with the terms of the [parties' arbitration] agreement' upon the motion of either party to the agreement (assuming that the 'making of the arbitration agreement or the failure … to perform the same' is not at issue.)" *AT&T Mobility LLC v. Concepcion* 131 S. Ct. 1740, 1748, 2011 U.S. LEXIS 3367 (2011) (quoting 9 U.S.C. § 4) (court's elipses). "The language of the statute is clear; a judge must compel arbitration if the parties have entered into a valid arbitration agreement and the dispute falls within the scope thereof." *Holden*, 2013 U.S. Dist. LEXIS 15368, *3 (citing *Patten Grading & Paving, Inc.*, 380 F.3d at 204).

Pursuant to the FAA, a court must grant a motion to compel arbitration and dismiss or stay a civil action if the movant establishes: "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate of foreign commerce, and (4) the failure, neglect or refusal of a party to arbitrate the dispute." *American Gen. Life & Accident Ins. Co. v. Wood*, 429 F. 3d 83, 87 (4th Cir. 2005). Here, all four requirements are satisfied.

### B. There Is a Dispute Between the Parties.

As shown in the Complaint, Answer and other filings in this action, UCB denies the material allegation of Plaintiff's Complaint and there is a dispute between the parties in this case over whether the actions undertaken by UCB violate state and federal laws.

**C.** **There Is a Written Agreement that Includes An Arbitration Provision that Cover the Parties' Dispute.**

Plaintiff's purported claims in this case fall squarely within the scope of the Arbitration Agreement. Plaintiff agreed to arbitrate, among other things, "all Claims relating to [Plaintiff's] account, a prior related account, or [Citibank's] relationship." (Card Agreement, attached as Exhibit A to the McNinch Decl., Docket No., 10, pp. 4.) This includes "all Claims … no matter what legal theory they are based on or what remedy" is sought. (*Id*.) Moreover, the Arbitration Agreement contains an express provision titled "What about debt collections," and states in part "We and any assignee may seek arbitration on an individual basis of any Claim asserted by [Plaintiff"]. (*Id.*, p. 5.) In the section of the Arbitration Agreement entitled "Whose Claims are subject to arbitration," it states that Claims subject to arbitration include claims made by Plaintiff "against anyone connected with [Citibank] or [Plaintiff] or claiming through [Citibank] or [Plaintiff], such as … an employee, agent, representative, affiliated company, predecessor or successor, heir, assignee, …." (*Id*.) Plaintiff's purported claims allegedly relate to the collection and enforcement of a credit transaction involving Plaintiff. Plaintiff asserted his claims against UCB, who has been assigned this Account for collection by Citibank and is connected with and claiming through Citibank, and thus all of the purported claims in this lawsuit fall within the scope of the Arbitration Agreement.

"[A] party's request to arbitrate an issue" may not be denied "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *American Recovery Corp v. Computerized Therman Imaging, Inc*., 96 F. 3d 88, 92 (4th Cir. 1996). "[T]he heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration." *Id*. (citations, internal quotation marks omitted).

Notably, it is not always the court's responsibility to determine whether a particular dispute falls within the scope of an arbitration clause. As the Supreme Court held, "parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center West, Inc. v. Jackson,* 561 U.S. 63, 68-69 (2010).

Plaintiff's wet ink signature is not required to be bound by the Card Agreement, including the Arbitration Agreement. Plaintiff specifically alleges in the Complaint that UCB "was collecting on an alleged debt originally owed to Citi Bank, N.A." (Complaint, ¶ 13.) The Card Agreement states it "is your [Plaintiff's] contract with us [Citibank, N.A.]" and "[t]his Agreement is binding on you unless you close your account within 30 days after receiving the card and you have not used or authorized use of the card." Plaintiff's admitted use of the account to make purchases indicates her acceptance of the terms and conditions. *See Rice v. Credit One Fin.*, 2015 U.S. Dist. LEXIS 97520, *3 (E.D.N.C. July 24, 2015) ("Here, the parties have clearly and unmistakably entered into a contract that contains an arbitration agreement. By 'requesting and receiving, signing and using' her Credit One credit card, plaintiff agreed to the terms of the Agreement, including arbitration, and formed a legally binding contract with Credit One."); *Gaynoe v. First Union Direct Bank, N.A.*, 2001 NCBC 1, 2001 WL 34000142 at *6 (N.C. Super. 2001) (cardholder's use of credit card issued by bank constituted acceptance of the contract terms). "Courts have consistently held that '[t]he use of [credit]cards amounts to acceptance of the terms of the cardholder agreements.'" *Whitman v. Capital One Bank (USA), N.A.*, 2009 U.S. Dist. LEXIS 108203, 6-7 (D. Md. Nov. 19, 2009) (quoting *Fahey v. U.S. Bank National Assoc.*, Civ. No. 05-1453, 2006 U.S. Dist. LEXIS 70956, 2006 WL 2850529 at *2 (E.D. Mo. Sep. 29, 2006)) (citing *Heiges v. JP Morgan Chase Bank, N.A.*, 521 F. Supp. 2d 641,

647 (N.D. Ohio 2007) (noting that "issuance and use of a credit card creates a legally binding agreement" and "[b]y simply using the card, [cardholder] agreed to be bound by the Agreement and all its terms")).

Further, to the extent Plaintiff attempts to avoid the Arbitration Agreement by asserting she is a nonsignatory, equitable estoppel would compel arbitration of Plaintiff's claims in this case. Courts in the Fourth Circuit recognize that a nonsignatory can be estopped from denying that it is bound by an arbitration clause when its claims against the signatory "arise[ ] from" the contract containing the arbitration clause. *Am. Bankers Ins. Group., v. Long*, 453 F.3d 623, 628 (4th Cir. 2006). The Fourth Circuit has stated:

> In the arbitration context, the doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him.

*International Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000). Thus, "[w]ell-established common law principles dictate that in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties. . . ." *Id*. at 416-17; see also *Am. Bankers Ins. Group.,* 453 F.3d at 628 (noting just as estoppel can apply against a signatory to an arbitration clause who sues a nonsignatory, it can also apply against a nonsignatory who sues a signatory).

In this case, Plaintiff challenges debt collection practices related to a debt owed under an agreement containing the arbitration clause. It is inconceivable that Plaintiff could assert her claims without reference to the rights and obligations set forth in that contract, and thus should not be allowed to ignore the arbitration agreement it contains. *See Tickanen v. Harris & Harris, Ltd*., 461 F. Supp. 2d 863, 869-70 (E.D. Wis. 2006) (holding plaintiffs were estopped from

refusing to arbitrate claims against a debt collector pursuant to an arbitration clause in their credit agreement with the owner of the debt).

This Court, however, need not make the determination as to whether Plaintiff's purported claims fall within the scope of the Arbitration Agreement, because the parties agreed that any issue as to the interpretation or enforceability of the Arbitration Agreement is for the arbitrator to resolve. Specifically, Plaintiff agreed to arbitrate "Claims regarding the application, enforceability, or interpretation of the [Contract] and the [Arbitration Agreement]. (*Id*. at p. 4.) "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter." *Beiler v. Fifth Third Bank*, 2014 U.S. Dist. LEXIS 84126, *11-12 (M.D.N.C. June 20, 2014) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995) (internal citations omitted) (emphasis in original). "Because the clause itself grants the arbitrator the power to determine whether any particular claim is arbitrable, this court must 'give considerable leeway to the arbitrator, setting aside his or her decision only in certain narrow circumstances.'" *Id*. (citing *First Options*). In the present case, any dispute over the scope of the Arbitration Agreement, including the threshold question of arbitrability of these particular claims, is for an arbitrator to decide. Therefore, this lawsuit should be compelled to arbitration because Plaintiff entered into a valid Arbitration Agreement and the dispute falls within the scope thereof.

> **D.      The Card Agreement, Including the Arbitration Agreement, Evidence Transactions Involving Commerce.**

If the contract at issue involves interstate commerce, as is the case here, the FAA applies and mandates enforcement of the terms of an arbitration agreement. 9 U.S.C. § 1. The Supreme Court has broadly applied the term "interstate commerce" in defining the reach of the FAA,

extending it to the limits of Congress' commerce clause power. *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 268 (1995) (Congressional intent in passing the FAA was to overcome the historical reluctance of courts to enforce arbitration agreements and to place them on the same footing as other contractual terms). The Supreme Court has held that "the term 'involving commerce' – [are] words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power. *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52 (2003) (per curiam). As a result, "it is perfectly clear that the FAA encompasses a wider range of transactions than those actually 'in commerce' – that is, 'within the flow of interstate commerce.'" *Id.* Consequently, the transaction in the contract containing the arbitration provision need not necessarily be an interstate transaction itself or even "have a 'substantial effect on interstate commerce'" to satisfy the FAA's "involving commerce" requirement. *Id.*

There is no doubt that the credit transaction at issue, as well as the collection efforts thereunder, involve and implicate interstate commerce for the purposes of the FAA. The Arbitration Agreement states that it is "governed by" the FAA. (Card Agreement, attached as Exhibit A to the McNinch Decl., Docket No., 10, pp. 5.) Courts interpreting similar language have held that it is dispositive regarding the application of the FAA, and enforce the contract as written. *See e.g., Staples v. Money Tree, Inc.*, 936 F. Supp. 856 (M.D. Ala. 1996) (holding in a case involving a consumer loan transaction in which the contract provides that it subject to the FAA, the court must enforce and apply the FAA to the arbitration agreement contained in the contract); *see also Pitchford v. AmSouth Bank*, 285 F. Supp. 2d 1286, 1290 (M.D. Ala. 2003) (loan by regional bank to finance purchase of truck constituted interstate commerce for purposes of FAA). Accordingly, even is Plaintiff were to make the argument that the transactions made on

the Account did not affect the flow of interstate commerce, those transactions are nevertheless transactions *involving* interstate commerce as defined by the Supreme Court.

**E.    Plaintiff Has Failed, Neglected, or Refused to Arbitrate this Dispute.**

As noted above, UCB sent Plaintiff's counsel the Arbitration Agreement and requested that Plaintiff submit her claims to arbitration.  Plaintiff, however, has not commenced arbitration and has refused to submit her claims to arbitration.  In other words, Plaintiff has failed, neglected, or refused to arbitrate her claims against UCB. Thus, UCB respectfully requests that the Court compel Plaintiff to arbitrate all purported claims asserted against UCB in accordance with and pursuant to the terms of the Arbitration Agreement.

**F.    The Case Should Be Dismissed Pending Arbitration.**

Once a court has determined that a case is arbitrable, the Fourth Circuit and this Court have recognized that a case should be dismissed where, like in this case, all of the issues can be resolved in arbitration.  *See, e.g.*, *Choice Hotels Int'l. v. BSR Tropicana Resort*, 252 F.3d 707, 709-10 (4th Cir. 2001) ("Notwithstanding the terms of § 3 [of the Federal Arbitration Act], however, dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable.")); *Holden v. AT&T Corp.*, No 1:12-cv-341, 2013 U.S. Dist. LEXIS 15368, at *8 (W.D.N.C. Feb. 5, 2013) ("Because all of the claims alleged in the Complaint are subject to arbitration, it is appropriate to dismiss this action rather than to stay it pending the completion thereof."); *accord Rice*, 2015 U.S. Dist. LEXIS 97520, *5 ("Reviewing the terms of the contract at issue in this matter, the Court finds that all of plaintiff's claims are subject to arbitration. Moreover, plaintiff did not offer any arguments or authority as to why a stay would be more appropriate than dismissal of their claims under these circumstances. Accordingly, plaintiff's claims are dismissed and this action is terminated.").

**II.**      **Alternatively, If The Court Declines To Compel Arbitration, These Proceedings Should Nonetheless Be Stayed.**

If the court does not compel arbitration, UCB respectfully submits the Court should stay this action in the interest of judicial economy and efficiency for two separate reasons: (1) the pending resolution of the challenges to the FCC Order currently before the Court of Appeals for the District of Columbia Circuit concerning what telephony system qualifies as an ATDS, which should be dispositive of TCPA claims asserted herein by Plaintiff, and (2) the pending class action settlement in *Graff*, which also should be dispositive of claims brought by Plaintiff in this case.

"As the United States Supreme Court has explained, 'the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" *Duke Energy Carolinas, LLC v. Frontier Communs. of the Carolinas, LLC*, 2014 U.S. Dist. LEXIS 108250, *15 (W.D.N.C. Aug. 6, 2014) (quoting *Landis v. North American Co.*, 299 U.S. 248, 254-55, 57 S. Ct. 163, 166, 81 L. Ed. 153 (1936). "The determination by a district judge in granting or denying a motion to stay proceedings calls for an exercise of judgment to balance the various factors relevant to the expeditious and comprehensive disposition of the causes of action on the court's docket." *United States v. Georgia Pacific Corp.*, 562 F.2d 294, 296 (4th Cir. 1977); *see also Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 375 (4th Cir. 2013).

**A.**      **The Court Should Stay This Litigation Pending Resolution of the Challenges to the FCC's Order Interpreting the TCPA.**

If the Court denies UCB's request to compel arbitration, it should stay this action pursuant to the doctrine of primary jurisdiction. As noted above, numerous lawsuits have been filed with various federal courts of appeal to challenge the FCC Order Interpreting the TCPA.

*See*, *e.g.*, *ACA Int'l v. FCC*, No. 15-1211 (D.C. Cir. filed July 10, 2015).    On July 24, 2015, the

United States Judicial Panel on Multidistrict Litigation consolidated these lawsuits into a single

case before the Court of Appeals for the District of Columbia Circuit (the "Challenge Lawsuit").

To date, at least ten lawsuits have either been consolidated or are pending consolidation with the

Challenge Lawsuit. *See Id*.

The FCC, is therefore, faced with the highly specialized issues raised by the Challenge

Lawsuit, and by the issues the FCC can be expected to raise in response. The resolution of

Plaintiff's alleged TCPA claims will turn on the ultimate definition of an ATDS under the

TCPA, which is one of the specific issues being litigated in the Challenge Lawsuit.

### i.    Primary Jurisdiction Doctrine.

The primary jurisdiction doctrine "is a doctrine 'specifically applicable to claims properly

cognizable in court that contain some issue within the special competence of an administrative

agency.  It requires the court to enable a 'referral' to the agency, staying further proceedings so

as to give the parties reasonable opportunity to seek an administrative ruling.'"  *Duke Energy*

*Carolinas, LLC*, 2014 U.S. Dist. LEXIS 108250, *13 (quoting *Reiter v. Cooper*, 507 U.S. 258,

265, 113 S. Ct. 1213, 1218, 122 L. Ed. 2d 604 (1993)).

"Generally speaking, the doctrine is designed to coordinate administrative and judicial

decision-making by taking advantage of agency expertise and referring issues of fact not within

the conventional experience of judges or cases which require the exercise of administrative

discretion."  *Environmental Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir. 1996); *see*

*also Union Elec. Co. v. Cable One, Inc.*, No. 4:11-CV-299, 2011 U.S. Dist. LEXIS 109552, 2011

WL 4478923 (E.D. Mo. Sep. 27, 2011) (discussing the primary jurisdiction in the context of the

FCC and its issuance of new regulations regarding the reasonable rate for pole attachments in the telecommunications industry).

Once a court determines that the primary jurisdiction doctrine applies and refers an issue to the appropriate entity, it may either retain jurisdiction and stay the case or dismiss the case without prejudice if none of the parties will be disadvantaged. *Reiter*, 507 U.S. at 265.

### ii. The FCC's July 2015 Order.

When Plaintiff's claims were originally asserted, the issues regarding non-telemarketing activity and the definition of an ATDS were pending before the FCC in several petitions for declaratory rulings seeking clarification regarding the TCPA.

On July 10, 2015, after a contentious 3-2 party line vote, the FCC Order was released, formally stating the FCC's interpretation of numerous provisions of the TCPA and expanding the law's scope in several areas, including its definition of an ATDS.

Under the FCC Order, any dialing equipment that "has the capacity to store or produce, and dial random or sequential numbers" is considered an ATDS for TCPA enforcement purposes, even if calls are not made using autodialing functions but instead were placed in a "manual" mode that involves a human entering the numbers on the telephone. *Id.* at ¶ 10. Under the FCC Order, a telephone system is an ATDS even if additional software components need to be added to make it function as such. *Id.* at ¶ 18. The only limitation on this expansive "capacity" definition is that "there must be more than a theoretical potential that the equipment could be modified" into an automatic dialer. *Id.* Although the FCC Order stated that one of the primary goals was to provide clarity to businesses wishing to comply with the TCPA, the FCC expressly declined to provide specific guidance on what types of systems would be caught up by

its definition, including smartphones. *Id.* at ¶ 21. The only specific example given of a system that would not be captured by its definition was a rotary telephone. *Id.* at ¶ 18.

The FCC Order — as it presently stands during the pendency of the Challenge Lawsuit — requires a factual inquiry into whether dialing equipment used to call cell numbers has the capacity to store or produce and dial random or sequential numbers. This aspect of the FCC's decision prompted a dissent from two of the five Commissioners, who argued that the FCC's reference to potential future capacity is contrary to the plain meaning of 47 U.S.C. § 227(a)(1). This issue lives on as it is now on appeal in the Court of Appeals for the District of Columbia Circuit. A stay of this case will give the parties and the Court much needed direction on the TCPA "capacity" issue that is at issue in the Challenge Lawsuit.

### iii.    **Challenge Lawsuit.**

While the FCC has issued its Order, it is appealable. As enacted by Congress, the Communications Act of 1934, ch. 652, 48 Stat. 1064 (codified as amended at 47 U.S.C.) provided a comprehensive scheme of federal regulation of wire and radio communication. *See generally Xavier University v. National Telecommunications,* 658 F.2d 306 (5th Cir. 1981). The Act established the FCC as a part of this scheme and charged it with "executing and enforcing the provisions of the Act." 47 U.S.C. § 151 (1976). Because the Commission was given both enforcement and decision-making responsibilities, *see* S.Rep. No. 781, 73d Cong., 2d Sess. 8-10 (1934), Congress chose to provide for *judicial enforcement and review* of its orders.

As such, if a party wishes to challenge an FCC order, "it may seek relief by appealing directly to a United States Court of Appeals." *Gulf Power Co. v. United States,* 187 F.3d 1324, 1327 (11th Cir. 1999) (citing 47 U.S.C. § 402(a)). Among other things, the court of appeals is empowered to enter "a judgment determining the validity of, and enjoining, setting aside, or

suspending, in whole or in part" the FCC's order." 28 U.S.C. § 2349(a). "[T]he court of appeals

. . . has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine

the validity of—(1) all final orders of the Federal Communications Commission made

reviewable by section 402(a) of title 47." 28 U.S.C. § 2342.

The Challenge Lawsuit challenges (1) the FCC's "treatment of 'capacity' within the

definition of an automatic telephone dialing system," (2) the FCC's treatment of predictive

dialers," and (3) the FCC's interpretation of the term "'prior express consent' (including its

treatment of reassigned numbers). *Id.* Specifically, the *ACA Int'l* Complaint argues that the

FCC's "treatment of 'capacity' within the definition of an [ATDS] under the [TCPA] is arbitrary,

capricious, and an abuse of discretion, and results in an approach that does not comport with a

caller's constitutional rights of due process and freedom of speech and that disregards the

applicable statute." It requests that the court "hold unlawful and set aside the [FCC's] treatment

of 'capacity' . . . and compel the [FCC] to treat 'capacity' in a way that comports with a caller's

rights of due process and freedom of speech." *ACA Int'l v. FCC*, No. 15-1211, Complaint at pp.

3–4. (D.C. Cir. filed July 10, 2015).

### iv.     Plaintiff's Claims Require Resolution of the Definition of an ATDS.

To prove his TCPA claims, Plaintiff must prove that UCB used an ATDS to call her cell

phone. *See* 47 U.S.C § 227(b)(1)(A)(iii). In this case, UCB maintains that calls placed to the

Plaintiff were manually dialed and that the telephony system used to call Plaintiff did not have

the present capability to randomly or sequentially call phone numbers. Under a plain reading of

the TCPA, UCB submits the telephone system used to place the calls at issue in this case is not

an ATDS. The FCC's interpretation in its Order, however, has caused significant confusion.

In the end, resolving the TCPA claims in this case requires a final resolution of the definition of an ATDS under the TCPA. Although the majority of the divided FCC concluded that the capacity of an ATDS includes its "potential" functionalities, the pending petitions for appellate review directly challenge this conclusion and instead ask the appellate courts to define capacity to store or produce telephone numbers to be called in terms of "present capability," rather than theoretical and potential functionalities.

If the appellate courts hold that an ATDS must possess a "present capability" when calls are placed, UCB submits Plaintiff's TCPA claims will fail for this reason alone. Accordingly, UCB requests the Court enter an Order staying this case in its entirety. Indeed, last week a federal district courts granted a stay on this very issue. *See Gensel v. Performant Technologies, Inc.*, Case No 13-C-1196 (E.D. Wis., October 20, 2015) (stay granted pending appeal of FCC's interpretation of ATDS).

**B.     The Court Should Also Stay This Litigation Pending Final Approval Of The *Graff* Class Settlement.**

In addition to the interests of judicial economy and those reasons noted above, the Court should stay these proceedings pending a decision on the final approval of the class action settlement in *Graff*, to which Plaintiff is a member of the proposed settlement class. To the extent the settlement class in *Graff* is approved, at that point in time, the release applicable to class members like Plaintiff will be determined, which will then allow for a resolution concerning which of Plaintiff's claims against UCB are barred by release and *res judicata*.

Plaintiff is a class member of the *Graff* settlement.[2]  If a class is clearly defined and adequately represented, its members are legally bound by settlements or judgments in the action.

---

[2] Plaintiff and her counsel were informed that she is a member of the proposed settlement class in *Graff*.  As stated in the Declaration of David Kaufman (ECF No. 10-1), Plaintiff is on the list of

*See In re School Asbestos Litig.*, 789 F.2d 996, 1005 (3d Cir.), *cert denied*, 479 U.S. 852, 107 S.Ct 182, 93 L.Ed 2d 117 (1986), and *cert denied*, 471 U.S. 915, 107 S.Ct 318, 93 L.Ed 2d 291 (1986); *see also George v Baltimore City Public Schools*, 117 F.R.D. 368, 371 (D. Md. 1987).

A class action settlement in the *Graff* litigation received preliminary approval on October 24, 2014. A final fairness hearing was held on May 5, 2015 and a decision is anticipated to follow shortly that will determine which of Plaintiff's claims in this litigation have been released and are barred by *res judicata*.

While UCB believes that the claims already dismissed by Plaintiff in this case will be encompassed by the settlement in *Graff*, it also maintains that additional claims in the present case, which Plaintiff has not dismissed, will be subject to the *Graff* settlement if it is approved and thus they will be precluded by doctrines of release and *res judicata*.

UCB submits this *Graff* Release may encompass any claim that is in any way related to a telephone communication from UCB to a *Graff* Settlement Class member during the class period (Feb. 19, 2013 through Oct. 29, 2014), including the Plaintiff in the present case. All of the telephone communications at issue in Plaintiff's Complaint are during this time period. UCB submits most of the factual allegations in the present lawsuit are "related to" the *Graff* factual allegations, or in the alternative, could have been raised in *Graff*, and thus would be covered by the *Graff* Release as proposed since it encompasses claims under "any other statute" like North Carolina statutory claims at issue in this case. Accordingly, staying these proceedings pending final approval of the *Graff* settlement is the most efficient way of managing these proceedings.

---

class members for *Graff*, she was sent notice of the pending class settlement, there is no record of the notice coming back as undeliverable or returned with a forwarding address, there is record of the class administrator receiving any correspondence from Plaintiff, and Plaintiff did not request exclusion from the pending settlement.

Under the circumstances of this case, Plaintiff cannot be heard to complain of any prejudice if this matter were stayed. In summary, the interests of justice as well as judicial economy combine to support a stay in this case pending resolution of the appeals to the FCC Order and final settlement approval in *Graff*.

## CONCLUSION

For all of the reasons set forth above,, Defendant United Collection Bureau, Inc. requests that this Court enter an ordering dismissing Plaintiff's Complaint without prejudice and compelling Plaintiff to submit her claims to arbitration, or, alternatively, staying the proceedings pending a final decision in the appeal of the FCC's July 2015 Ruling and final settlement approval in *Graff*, and granting UCB such other relief as this Court deems appropriate and just.

This 30th day of October, 2015.

TROUTMAN SANDERS LLP

By: ____/s/ D. Kyle Deak_____
   D. Kyle Deak
N.C. Bar No. 35799
Attorneys for the Defendant
434 Fayetteville Street, Suite 1900
Raleigh, North Carolina 27601
Telephone: (919) 835-4133
kyle.deak@troutmansanders.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 30, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and that notices would be delivered electronically to counsel for the parties.

M. Shane Perry
COLLUM & PERRY
109 W. Statesville Ave.
Mooresville, NC 28115
shane@collumperry.com
*Counsel for Plaintiff*

TROUTMAN SANDERS LLP

By: \_\_\_\_/s/ D. Kyle Deak\_\_\_\_\_
    D. Kyle Deak
N.C. Bar No. 35799
Attorneys for Defendant
434 Fayetteville Street, Suite 1900
Raleigh, North Carolina 27601
Telephone: (919) 835-4133
kyle.deak@troutmansanders.com

27414789v1